IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOANNE CREELMAN,** | : | No. 3:04cv1618 |
| **Plaintiff** | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| **E.I. DUPONT DE NEMOURS & CO.,** | : | |
| **AETNA LIFE INSURANCE CO.,** | : | |
| **and TOTAL AND PERMANENT** | : | |
| **DISABILITY INCOME PLAN FOR** | : | |
| **E.I. DUPONT DE NEMOURS & CO.,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Presently before the Court for disposition is a motion for summary judgment filed by Defendants E.I. DuPont De Nemours & Co. ("DuPont"), Aetna Life Insurance Co. ("Aetna") and the Total and Permanent Disability Income Plan for E.I. DuPont De Nemours & Co. ("the Plan"). In response to this motion, Plaintiff Joanne Creelman filed a cross motion for summary judgment. The parties have fully briefed these motions and they are ripe for disposition. For the following reasons, we will grant the defendants' motion for summary judgment.

**I.     Background**

Joanne Creelman was born on June 17, 1968, and has suffered from lower back pain since 1992. (Compl. Ex. F(D)(1), Long Term Disability Application.) From 1986 to March 2002, she worked as an operator for DuPont. (Id.) This job required pushing, pulling, and some heavy lifting. The severity of her back pain increased in June 2001. (Compl. Ex. F(D)(1), Long Term Disability Application.) On July 16, 2001, she first missed work due to

the pain. (Def. Stat. of Facts Ex. 2.) On July 31, 2001, her treating physician, Dr. Hoda, prescribed a leave of absence until he could determine the cause of her back pain. (Compl. Ex. F(D)(3), Dr. Hoda note dated July 31, 2001.)

Dr. Hoda reviewed x-rays of Creelman's spine and determined that she had "degenerative disk disease with posterior spurring and retolisthesis" at the third at fourth lumbar vertebrae ("L3 and L4"), along with central disc herniation of the L3 and L4. (Compl. Ex. F(D)(3), Dr. Hoda note dated August 8, 2001.) He made an appointment for her to see a neurosurgeon. (Id.)

On August 14, Dr. Hein Anton, a neurosurgeon, examined Creelman, and based on the results of a magnetic resonance image ("MRI"), wrote a letter to Dr. Hoda explaining that "[h]er neurological evaluation today is totally unremarkable. There are no neurological findings whatsoever. Her MRI scan shows that she has congenital narrowing of the lumbar spinal canal and some degenerative changes in her lumbar disks, especially L3-L4 level, but no nerve compressions or any other abnormal findings otherwise in her lumbar spine." (Compl. Ex. F(D)(3), Dr. Anton letter to Dr. Hoda dated August 14, 2001.) Following this report, Dr. Hoda allowed her to return to "light duty" work on August 22, 2001, but restricted her from lifting over ten pounds and from sitting, standing, or walking for prolonged periods of time. (Compl. Ex. F(D)(3), Dr. Hoda note dated August 14, 2001.) Creelman returned to work under these restrictions as approved by DuPont's onsite doctor, Dr. Paulish, but was unable to complete a full work week. (Compl. Ex. F(D)(5), Dr. Paulish's notes.)

On October 17, 2001, Dr. Saeed Bajwa, a neurosurgeon, examined Creelman to

diagnose her back pain.  (Compl. Ex. F(D)(3), Dr. Bajwa Letter to Dr. Hoda, dated October 18, 2001.)  He performed a neurological examination, a motor examination, a sensory examination, and he tested her reflexes, and found the results unremarkable.  (Id.)  He determined that weight loss was the best treatment for her back.  (Id.)  On November 21, 2001, Dr. Burdett Porter administered an epidural steroid block injection to relieve Creelman's back pain.  (Compl. Ex. F(D)(3), Letter from Dr. Porter to Dr. Hoda, dated December 5, 2001.)

On December 3, 2001,  Dr. Hoda reevaluated Creelman's situation.  (Compl. Ex. F(D)(3), Dr. Hoda note dated December 3, 2001.)  Dr. Hoda noted that although her pain had been treated by an epidural injection, it recurred when she returned to work.  (Id.)  He also observed that her lifting limit was twenty pounds.  (Id.)  He suggested that she take pain medication, receive another epidural injection, and lose weight.  (Id.)  He did not add further work restrictions or limit the total number of hours she could work in a day or a week.  (Id.)

On January 30, 2002, DuPont sent Creelman a letter explaining that her back condition prevented her continued employment as an operator at DuPont.  (Compl. Ex. A.)  It recognized that her short term disability began on July 16, 2001, and that from then until January 16 she had worked partial shifts, some full shifts, and spent some days doing administrative work. (Id.)  It found, however, that she was unable to work as an operator, the job could not be altered to accommodate her condition, and DuPont had no openings for less strenuous positions that she could perform despite her pain.  (Id.)  Thus, DuPont informed her that her termination date would be March 31, 2002, and it initiated the process to determine her eligibility for disability benefits under the Plan.  (Id.)

3

On February 1, 2002, Creelman completed Aetna's long term disability claim application, (Compl. Ex. B) and filed an accompanying Attending Physician's Statement, completed by Dr. Hoda. (Def. Stat. of Facts Ex. 2.)  Dr. Hoda reported that she was unable to do heavy lifting, and could not stand for prolonged periods of time at work. (Id.)  He further explained that she had a moderate but not severe limitation on her functional capacity, and was capable of sedentary employment, such as clerical or administrative work. (Id.)  He did not indicate that she was limited in the total number of hours that she would be able to work in a day or a week. (Id.)  In addition, he found that she was a good candidate for vocational rehabilitation. (Id.)

On February 22, 2002, Aetna performed a Transferrable Skills Analysis, which provided that an individual with Creelman's skills and experience would be able to perform forty transferrable occupations based on the restrictions identified by Dr. Hoda. (Compl. Ex. F(C).)  The jobs included work as a dispatcher or order clerk. (Id.)

On February 28, 2002, at Aetna's request, Concentra Managed Care Services ("Concentra") prepared a Labor Market Survey Report detailing whether gainful employment within her abilities and physical capabilities was available in her geographic area. (Compl. Ex. F(C) at 1.)  Concentra listed seventeen sedentary positions available in Creelman's geographic area within her capability. (Id. at 1-12.)  Of these seventeen positions, three had openings available, and many satisfied Creelman's reasonable wage of $10.86 per hour. (Id. at 12.)

On March 5, 2002, Aetna representative James Snow rejected her application for total disability benefits under the Plan. (Compl. Ex. F(B).)  He explained that to be eligible for

4

benefits "an individual must be totally and permanently disabled by injury or disease from pursuing any gainful occupation." (Id.) He also reported that a gainful occupation is any occupation paying 60% of the plaintiff's wages in her former job at DuPont. (Id.) After reviewing the Labor Market Survey, the Transferable Skills Analysis, and Creelman's medical history, Aetna determined that gainful employment was available, and thus she was ineligible for permanent disability benefits. (Id.)

On April 26, 2002, Creelman appealed this decision by writing a letter to Aetna. (Def. Stat. of Facts, Ex. 3.) She explained that subsequent to Snow's March 5 letter, Dr. Hoda clarified that she could neither stand nor sit for prolonged periods, and thus could not perform the positions listed by Aetna and Concentra. (Def. Stat of Facts, Ex. 3.)

Aetna then forwarded her medical records to its medical director, Dr. Amy Hopkins, a physician board certified in occupational and internal medicine. (Def. Stat. of Facts, Ex. 4.) Dr. Hopkins reviewed Creelman's medical reports, tests, and history. (Compl. Ex. F(D).) She observed that although Creelman did suffer from back pain, her MRI revealed no significant pathology. (Compl. Ex. (F)(D).) She recognized that Dr. Hoda restricted her to sitting no more than four hours at a time, but explained:

> Since most people get up and move around during the day, this would not imply any specific restriction. Even if EE [employee] does develop some back pain with sitting, this does not imply that she is actually physically impaired from it. There was no actual objective support in this record for any particular back restrictions, including lifting and sitting. Back pain is very common in the general population, and most people continue to perform jobs of all work categories despite the presence of discomfort. There was no evidence in this record that EE's [employee's] back problems were of a nature or severity to cause any specific impairment.

5

Id.

Aetna rejected her appeal on September 20, 2002. (Def. Stat. of Facts, Ex. 4.) In reaching its conclusion, Aetna relied on Dr. Hopkins' analysis, the Transferrable Skills Analysis, and a Labor Market Survey. (Id.) Aetna recognized that she could sit for only four hours at a time, but consistent with Dr. Hopkins' opinion, determined that she would be able to change positions while working. (Id.)

On February 5, 2004, Creelman filed an appeal with DuPont, arguing that she could not work full-time and thus was unable to engage in gainful employment. (Compl. Ex. F.) She attached numerous documents, including her medical records, the Labor Market Survey, her termination letter, a letter from a vocational and rehabilitation specialist, and her own affidavit. (Compl. Ex. F.) Incorporated into her medical records was a letter from Dr. Hoda to her attorney dated August 18, 2003, almost a year after Aetna previously denied benefits. (Compl. Ex. F(D)(7).) Therein, Dr. Hoda stated, "This letter is in response to your letter, requesting answers to the following questions. . . . . 6.     Job Capability: She is capable of working part time, 4 hours per day, with no heavy lifting or prolonged standing." (Id.)

On April 26, 2004, DuPont's Board of Benefits and Pensions rejected Creelman's final appeal. (Compl. Ex. G.) The Board considered its own file as well as her submissions, including Dr. Anton and Dr. Bajwa's reports, Dr. Hoda's attending physician statement, the MRI reports, and the Labor Market Survey. (Id.) It noted that Dr. Hoda's attending physician statement specified restrictions in heavy lifting and prolonged standing. (Id.) It recognized that Dr. Hoda's August 18, 2003 letter explained that Creelman could work part-time, but

6

concluded, "Dr. Hoda only commented in his letter to you about Ms. Creelman's capability of working part time because that was the question you posed to him." (Id.)

Dr. Hoda's statement that Creelman was able to work part-time was not, in fact, in response to a question specifically about her ability to work part-time. (Compl. Ex. H.) The statement to which he responded was: "Your opinion as to whether Ms. Creelman is capable of working a full time job and you opinions as to what types of work she is capable of doing." (Id.) The Board, however, was not provided with the question, only Dr. Hoda's response. (Compl. Ex. F.)

**II.     Standard**

Where an ERISA plan provides plan administrators with discretion to determine eligibility for benefits, courts review their decision under the arbitrary and capricious standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989). If the administrators operate with a conflict of interest, however, "that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" Id. at 115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 18, cmt. d (1959)).

In Pinto v. Reliance Standard Life Insurance Co., the court analyzed how to factor a conflict into the standard of review of decisions denying ERISA benefits. 214 F.3d 377 (2000). There, the employer paid an independent insurance company to fund, interpret, and administer the plan. Id. at 384. The court found that the potential for self dealing inherent in this arrangement required enhanced scrutiny because the insurance company would derive a direct financial benefit from denying the claim. Id. at 389. The court noted that "the most

deferential review was appropriate when the employer had 'incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits,'" Id. (quoting Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991)), but found that the administrator had no such incentive because it was an independent insurance company, and not the claimant's employer. Id.

After determining that a conflict existed, the Pinto court analyzed the proper way to incorporate the conflict into its review. Id. at 390-92. Circuit courts had employed three methods: "burden shifting, de novo review, and the sliding scale." Id. at 390. Pinto adopted the burden shifting approach, reasoning, "[t]hat approach allows each case to be examined on its facts. The court may take into account the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company." Id. at 392.

Following Pinto, numerous courts have applied the sliding scale approach, and Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250 (3d Cir. 2004) applied this method to the precise plan presently before this Court. In Stratton, the plan was both funded and administered by DuPont, but DuPont outsourced the initial claims administration to Aetna and used an internal benefits committee to make the ultimate benefits determination. Id. at 254-55. Stratton recognized that DuPont may have a conflict of interest because it both funded and administered the plan. Id. However, it found that the conflict warranted only "slightly less deferential" arbitrary and capricious review because of the procedural safeguards in place and because the evidence at issue was provided by doctors affiliated with Aetna and not DuPont,

8

and thus were not affected by the conflict of interest. Id.

Creelman argues that Stratton is distinguishable because there the plaintiff was an employee and DuPont had an incentive to maintain her morale, whereas she was no longer an employee when DuPont denied her benefits. We find this consideration irrelevant.

Stratton found that the conflict inherent in the funding arrangement was mitigated by the procedural safeguards, and specifically stated that it did consider the loss of morale concern as a mitigating factor. Id. "Dupont may have some incentive to deny coverage on individual requests, *assuming that it has no interest* in 'avoiding the loss of morale and higher wage demands that could result from denials of wage benefits.'" Id. at 254 (emphasis added) (quoting Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991)).

Moreover, Creelman's status as a former employee does exacerbate a conflict, but rather mitigates it, although to a lesser extent than if she were a current employee. Smathers v. Multi-Tool, 298 F.3d 191, 198 (3d Cir. 2002). In Smathers, the plan administrator had a conflict because Multi-Tool, the plaintiff's former employer, both administered and partially funded the plan.[1] Id. at 197-98.

> Since Smathers was no longer an employee when Multi-Tool made its decision to deny his claims, the counterbalancing of its monetary self-interest by possible concerns about the impact of its decision on morale and wage demands would thereby be lessened. The employer would still have the incentives discussed in Nazay in regards to its current employees, however, the incentives would not be as strong as they would

---

[1] Individual claims were paid by an insurance company and not Multi-Tool, but the court found that Multi-Tool had a financial interest in denying claims because it had a $ 30 thousand deductible. Smathers, 298 F.3d at 197-98.

if Smathers were still a Multi-Tool employee.
Id. at 198.

The Court explained that an administrator will have no concern for loss of employee morale only where it is an independently hired insurance company, but will have a concern where it is an employer. Id. 198. "[W]e have explained that the risk of a conflict of interest is decreased where the administrator and funder of the plan is the employer, rather than an insurance company, because the employer has 'incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits." Id. (quoting Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991)); see also Pinto, 214 F.3d at 389 (finding that where an insurance company hired by the employer administers and funds the plan it has no incentive to avoid loss of employee morale). Despite Multi-Tool's financial self-interest, the court held, "[b]ecause the conflict here is not extraordinary, we will not slide very far down the scale."[2] Id. at 199. Thus, even though Multi-Tool did not employ the procedural safeguards present in Stratton and in the instant case, the Smathers court applied the same heightened arbitrary and capricious standard of review used in Stratton. Compare Id. at 199 (reviewing whether the administrator's decision was "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan); with Stratton, 363 F.3d at 256 (quoting Smathers, 298 F.3d at 199) (applying the Smathers standard of review).

Under the Smathers reasoning, Creelman's status as a former employee does not require

---

[2] Smathers did not address whether Multi-Tool had procedural safeguards to ensure neutrality, as DuPont has here, and therefore the only mitigating factor in Multi-Tool was Stratton's status as a former employee.

that we employ greater scrutiny than the "slightly less deferential" standard announced in Stratton. If we consider this factor in the sliding scale review, Creelman's status would counterbalance the conflict inherent in the funding arrangement because DuPont has an interest in maintaining the morale of its current employees, and this factor would require that we provide greater deference to DuPont's decision. Thus, like the Stratton court, we will assume DuPont has no interest in maintaining employee morale, and taking into account DuPont's financial interest and the procedural safeguards in the Plan that ensure the neutrality of the decision-maker, we will apply the Stratton "slightly less deferential" arbitrary and capricious review.

### III.     Discussion

Under the "slightly less deferential" arbitrary and capricious review, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Stratton, 363 F.3d at 256. We will focus solely on the first inquiry because Creelman does not argue that Aetna or DuPont failed to comply with Plan procedures.

Creelman argues that DuPont's decision erred in two ways. First, she argues that it misinterpreted Dr. Hoda's August 18, 2003 letter, and had DuPont properly interpreted the letter it should have deemed her limited to part-time work. Second, she argues that Dr. Hopkins' report lacked credibility because Dr. Hopkins never examined Creelman and her report was contrary to the medical evidence in the record. We find each of these arguments unavailing, and hold that DuPont's decision to deny benefits was supported by the record.

Dr. Hoda's August 18, 2003 letter stated, "This letter is in response to your letter, requesting answers to the following questions. . . . . 6.     Job Capability: She is capable of working part time, 4 hours per day, with no heavy lifting or prolonged standing." (Compl. Ex. F(D)(7).)  The Board interpreted this report as an affirmative response to a question of whether Creelman was capable of part-time work. "Dr. Hoda only commented in his letter to you about Ms. Creelman's capability of working part time because that was the question you posed to him." (Compl. Ex. G).)

Creelman argues that in retrospect, the Board erred in its interpretation. She submits two documents to demonstrate that this interpretation was erroneous. First, she submits the actual question posed to Dr. Hoda, which reveals that he responded to an open-ended question about her work abilities. (Compl. Ex. H.) Second, he submits Dr. Hoda's April 21, 2005 affidavit stating that his August 18, 2003 letter explained that Creelman could work only part-time. (Doc. 17, Pl. Stat. of Facts, Ex. B-1.) Neither of these documents or the evidence contained therein was available to DuPont during the appeals process. (Compl. Ex. F.) Thus, they are irrelevant to our review of the reasonableness of DuPont's decision and we will not consider them here. Kosiba v. Merck & Co., 384 F.3d 58, 69 (3d Cir. 2004) (providing that "review of these determinations should be based on the record available to the plan administrator in making its own decision . . . . 'In effect, a curtain falls when the fiduciary completes its review. . . the district court must evaluate the record as it was at the time of the

12

decision.'").[3]

Based on the record available to the Board, we find that its interpretation of Dr. Hoda's report was reasonable and its conclusion that Creelman could work full-time was supported by the record. Dr. Hoda never identified the question to which he responded, and the only indication of what question was posed was the content of the answer, which does not specify that Creelman was limited to part-time or incapable of working full-time.

While the Board may have inferred from Dr. Hoda's statement that he deemed Creelman incapable of full-time employment, such an inference would have been inconsistent with Dr. Hoda's previous statements regarding her limitations as well as the great weight of the evidence in the record. For example, on August 14, 2001, Dr. Hoda wrote a note allowing Creelman to return to work full time on "light duty," providing that she avoid heavy lifting or sitting or standing for prolonged periods of time. (Compl. Ex. F(D)(3), Dr. Hoda note dated August 14, 2001.) This note did not specify a limit to the number of hours Creelman could work in a week or a day, and did not limit her to part-time work. (Id.) On December 3, 2001, while Creelman was still working, Dr. Hoda noted that her lifting limit was twenty pounds, suggested that she take pain medication and lose weight, but did not add further work restrictions or limit the total number of hours she could work in a day or week. (Compl. Ex. F(D)(3), Dr. Hoda note dated December 3, 2001.) Similarly, Dr. Hoda's February 5, 2002 Attending Physician's Statement

---

[3] Creelman also argues that the Board should have requested clarification if it found any ambiguity in Dr. Hoda's letter. An ERISA plan administrator has no duty to conduct an investigation, but merely must make a decision based on the evidence available. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 394 n.8 (3d Cir. 1999).

reported that Creelman was unable to do heavy lifting, and could not stand for prolonged periods of time at work but provided no limitation on Creelman's ability to work full-time. (Def. Stat. of Facts Ex. 2.)

Furthermore, on August 14, Dr. Rein Anton opined that "[h]er neurological evaluation today is totally unremarkable. There are no neurological findings whatsoever. Her MRI scan shows that she has congenital narrowing of the lumbar spinal canal and some degenerative changes in her lumbar disks, especially L3-L4 level, but no nerve compressions or any other abnormal findings otherwise in her lumbar spine." (Compl. Ex. F(D)(3), Dr. Anton Letter to Dr. Hoda dated August 14, 2001.) Dr. Hickey stated that she had no impairments that would prevent her from full-time employment. (Compl. Ex. (F)(D).) Dr. Bajwa performed numerous objective tests, found the results unremarkable, and suggested no treatment other than weight loss. (Compl. Ex. F(D)(3), Dr. Bajwa Letter to Dr. Hoda, dated October 18, 2001.) Therefore, we find that the Board's interpretation of Dr. Hoda's August 18, 2003 letter and its conclusion that Creelman could work full-time was supported by the evidence available to it.

We also find that the Board properly accepted Dr. Hickey's opinion. Creelman argues that it should have rejected her opinion because she did not personally examine her and it was inconsistent with Dr. Hoda's and Dr. Paulish's restrictions. Dr. Hickey opined that Creelman could perform any occupation without limitation, but Dr. Hoda and Dr. Paulish determined that she could not perform heavily lifting, or sit or stand for prolonged periods of time.

We find that neither argument demonstrates that the Board's decision or Dr. Hickey's report was clearly unsupported by the evidence in the record. Although Dr. Hickey disagreed

14

with Dr. Hoda and did not personally examine Creelman, Dr. Hickey's conclusion was based on her consideration of Dr. Hoda's medical records, Dr. Anton's reports, the Labor Market Survey, and the Transferrable Skills Analysis. Her disagreement raises from differing interpretations of Creelman's medical records. Where two doctors provide a differing analysis based on the same records, deference to the administrators is appropriate. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833-834 (2003) (finding it inappropriate to require plan administrators to afford deference to a treating physician's opinion).[4]  For example, in Stratton, the opinions Aetna's physicians differed from the plaintiff's treating physicians. Stratton v. E.I. DuPont, 363 F.3d 250, 258 (3d Cir. 2004). The court explained:

> The professional disagreement between Aetna's consulting physicians and Stratton's physician seems grounded in differing conclusions based on the review of Stratton's MRI, past medical history, and the likelihood that the chosen course of action would be successful or not. Because Black & Decker Disability Plan holds that plan administrators are not obliged to defer to the treating physician's opinion, the District Court did not err in upholding the decision of the plan administrators.

Id.

Thus, the administrators were not required to place any greater emphasis on Dr. Hoda's report because he examined Creelman and Dr. Hickey did not. The Board merely was prohibited from "arbitrarily refus[ing] to credit a claimaint's reliable evidence." Id. at 258 (quoting Black & Decker, 538 U.S. at 834).

We find that the Board did not arbitrarily refuse to credit Dr. Hoda's reports, and in fact,

---

[4] Black & Decker did find that in close cases deference to the treating physician may be appropriate if the consulting physician had an incentive to make a finding of "not disabled." Id. at 832. Dr. Hickey, however, was employed by Aetna, which has no financial interest in rejecting Creelman's claim.

appropriately considered them in conjunction with the other evidence. The record supports the Board's conclusion that even considering Dr. Hoda's restrictions on heavy lifting and prolonged standing, Creelman could engage in gainful employment. The Labor Market Analysis accounted for Dr. Hoda's restrictions and found that she could engage in gainful employment because she could obtain sedentary employment. Additionally, Dr. Anton's report found that Creelman's MRI revealed no nerve compressions or abnormal findings to support a conclusion that she suffered from disabling pain. Finally, Dr. Hickey concluded that the objective medical evidence established that Creelman was not disabled.

A district court "may not substitute its own judgment for that of plan administrators under either the deferential or heightened arbitrary and capricious standard." Stratton v. E.I. DuPont, 363 F.3d 250, 256 (3d Cir. 2004) (citing Smathers v. Multi-Tool, 298 F.3d 191, 199 (3d Cir. 2002)). Thus, based on the record before the Board, we cannot find that its decision was clearly unsupported by the record. Although Creelman has back pain and some restrictions, Dr. Hickey's report, Dr. Bajwa's report, and Dr. Anton's analysis supports the Board's conclusion that she could perform sedentary work constituting gainful employment. Therefore, we will grant the defendants' motion for summary judgment. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOANNE CREELMAN,** | : | No. 3:04cv1618 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| v. | : | |
| | : | |
| **E.I. DUPONT DE NEMOURS & CO.,** | : | |
| **AETNA LIFE INSURANCE CO.,** | : | |
| **and TOTAL AND PERMANENT** | : | |
| **DISABILITY INCOME PLAN FOR** | : | |
| **E.I. DUPONT DE NEMOURS & CO.,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

    **AND NOW**, to wit, this 31st day of August 2005, it is hereby **ORDERED** that the defendants' motion for summary judgment (Doc. 11) is **GRANTED**. The Clerk of Court is directed to enter judgment on behalf of the defendants and close this case in this District.

                                              **BY THE COURT:**

                                              **s/ James M. Munley**
                                              **JUDGE JAMES M. MUNLEY**
                                              **United States District Court**